**STATE of Missouri,
Plaintiff-Respondent,**

v.

**Ray Gene STOUT, Defendant-Appellant.**

**No. KCD 30354.**

Missouri Court of Appeals,
Western District.

Dec. 3, 1979.

Kenneth D. Kyser, Moberly, for defendant-appellant.

John Ashcroft, Atty. Gen., Jefferson City, Earl W. Brown, III, Sp. Asst. Atty. Gen., Kansas City, for plaintiff-respondent.

Before DIXON, P. J., and TURNAGE and KENNEDY, JJ.

KENNEDY, Judge.

The defendant Ray Gene Stout was convicted upon jury trial in the Circuit Court of Randolph County of the crime of kidnapping for ransom as defined by § 559.230, RSMo 1969. He was sentenced in accordance with the jury verdict to 25 years' imprisonment by the Division of Corrections. From that judgment defendant has appealed to this court.

Appellant's first point goes to the sufficiency of the evidence. We find that the evidence was sufficient to support the charge and verdict, and we rule this point against the appellant.

We here copy subsection (1) of § 559.230, RSMo 1969, under which defendant was charged: "If any person shall willfully, without lawful authority, seize, confine, inveigle, decoy, kidnap, abduct, take or carry away by any means, or attempt so to do, any other person and attempt or cause such other person to be secretly confined against his will, or abduct for the purpose and with the intention of causing anyone else, to pay or offer to pay any sum as ransom or reward for the return or release of the other person or with the intention and purpose of requiring anyone to perform some specific act for the return or release of the other person, the person or persons so guilty of

the above mentioned acts or act, shall, on conviction, be punished by imprisonment by the division of corrections for not less than five years." § 559.230(1).

We will now recount the evidence, all of which was presented by the state. The defendant presented none.

Sheila Jo Embree returned to her apartment from her employment as a realty office secretary at about four o'clock in the afternoon of Friday, December 23, 1977. At about 4:30 the doorbell rang. A man later identified as Marion Holloway was at the door. She admitted him to the house to use the telephone. He dialed a number and Sheila, sitting nearby, heard a busy signal. He then produced a small black gun, and forced Sheila to lie down on the floor. He wiped his fingerprints from the phone, using a towel from the kitchen. He tied Sheila's hands behind her back and blindfolded her with tape.

Sheila heard a second person enter through the back door and heard them rummage through her purse. One of the two ran up the stairs of the townhouse apartment and shortly came back down. They whispered to each other but Sheila could not understand what they were saying.

The men then conducted Sheila out the back door to a car on the parking lot. She could see under the tape blindfold and recognized the grass and the parking lot gravel and knew where she was being taken. She was placed in the back seat of a two-door car. The two men got in the car, closed the door and drove out on the driveway. Sheila was lying down in the back seat in compliance with their instructions.

Sheila was able later, by reference to stops, turns, railroad tracks and road surfaces, to describe the route which the car followed out of the City of Moberly and, more vaguely, their trip through the countryside.

At length they turned into a house with a gravel driveway, off a paved or blacktop road. The car stopped and Sheila was led into the house. She was placed on a bed and was given a pillow and a green Army blanket. During all the time she was kept at the house and until her release, she was not allowed off the bed except to go to the rest room. At least one other person was in the house besides the two who had transported her there. Her captors ultimately proved to be three in number—Holloway, the defendant Stout, and a third man, named Sidney Allen Robb.

The next day in daylight Sheila was able to observe from under the blindfold several features of the room where she was kept—carpet, drapes, bed, electric heater, and the adjoining bathroom—which enabled her to identify the place later.

On Friday evening Sheila heard one of her two captors say, "We have got to go call Joe". The voice sounded familiar. She heard the same voice twice the next morning, Saturday. She began to suspect that it was the voice of Ray Gene Stout. On Saturday afternoon she saw and recognized the defendant Stout through the blindfold.

Sheila Jo had been acquainted with the defendant Stout for a considerable period of time. He had worked for her father's basement construction business at Sturgeon while she was still in high school before 1971, and until 1974. The defendant, his wife and son had come to her parents' lake for picnics and fishing. Defendant and his wife came to Sheila Jo's wedding in September, 1972. Although she might have seen the defendant once or twice since that time, it had been at least four years since she had seen him.

On Saturday evening the person she had recognized as Stout told Sheila Jo that "he came from a family where if his mother knew what he had done it would break her heart" and "where his brothers had given his parents a lot of trouble". Twice he asked her if she recognized his voice, and she told him that she did not. He said he was from California. He told her she was being held for $25,000 ransom.

Later on that night the others, who had been absent from the house while Stout kept Sheila Jo under guard, returned to the house with the ransom money, overjoyed and excited. They divided the money in the

room where Sheila was being kept. Holloway gave Sheila a $50 bill, explaining to her that that was in payment for the money they had taken from her billfold "plus interest". The $50 bill was later identified as part of the ransom money.

Sheila was placed in the same car which was used to bring her to the house. Two of the men took her to a point near her parents' house near Sturgeon and let her out of the car. At about 12:30 a. m. Sunday morning, Christmas day, she arrived at her parents' house. She was in a disheveled and highly emotional state.

Dwayne Embree, husband of Sheila, and Joe Robinson, her father, testified to receiving a telephone call at the Embree residence in Moberly after Sheila's disappearance on Friday evening. The call, taken by Joe Robinson, Sheila's father, told him where he could find a note behind the buildings at his lumberyard in Sturgeon. Sturgeon is 16 miles from Moberly. They located the note, which was addressed to Joe Robinson and Dwayne Embree, and which named a ransom price of $25,000. The note said that they would receive later instructions by telephone where to take the money. The next evening Robinson received the call with the instructions. He was to take the "Tri-City Lake Road to the first curve, and I would find a Dr. Pepper bottle sitting in the road; for me to put the money by the bottle, and back my car back to the blacktop, head toward Centralia, and blink my lights twice, and drive on". Robinson complied with the instructions.

The money, in a City Bank cloth bag, with the words "City Bank and Trust" written thereon, contained the money in $20, $50 and $100 bills. The cloth bag was placed inside a brown paper sack.

Sheila's observations enabled her to locate and identify the house on Monday, which was unoccupied at the time they located it. Located under the mattress of the bed was $9,960 of the ransom money, and the cloth bag.

Other evidence showed that defendant Ray Gene Stout had rented the house where Sheila was kept, on December 19th, under the name of "Jack Beach", and had paid $75 rent. With the help of witness Richard Bell, who had directed defendant Stout to this particular house, he had moved a wood frame bed into the house.

Witness Bell further testified that three or four days after Christmas he had received a call from defendant Stout at the Ramada Inn in St. Louis. Stout wanted a ride from St. Louis to Des Moines, Iowa. Bell declined to furnish him the ride, but on a second telephone call the next day Bell yielded to Stout's importunity, and he and his wife went to St. Louis. They picked up Stout and "Luigi"—shown to be Holloway—at the Ramada Inn. They started to Des Moines, but changed their minds and decided they would go instead to Quincy. Bell took them to the Holiday Inn in Quincy. On the St. Louis-Quincy trip Bell asked defendant "if he really did it". Defendant replied, "Yes". Defendant also told another witness, at Quincy, that he was "running from the FBI . . . for kidnapping and robbery and stuff" and that "we're the ones that kidnapped that woman over in Moberly, I guess."

Witness Bell said that at about the time he had assisted Stout to move the bed into the rented house, Stout "said something about he ought to go rob a bank or kidnap somebody", but Bell did not take him seriously.

*Sufficiency of the evidence.*

■ Defendant's challenge to the sufficiency of the evidence must fail, for the evidence is abundantly sufficient to support the accusation and the verdict of the jury.

Defendant here argues a theory that the victim, Sheila Jo Embree, was not an unwilling hostage, but rather was a co-conspirator with her ostensible abductors in a scheme to bilk her husband and father out of the ransom money. There is no scintilla of direct evidence to support this theory. Defendant points to the fact that Sheila Jo had come home to her apartment an hour earlier than usual on the afternoon of her abduction; that she was not abused by her captors, but was allowed to use her hair-

brush and personal items, and was made as comfortable as circumstances would permit; and that $9,960 of the ransom money had been left in the house. He points out also that Sheila and her husband had been social acquaintances of the defendant in earlier years.

Of course, in determining the sufficiency of the evidence to support the verdict, we consider only the evidence and inferences therefrom, tending to support the same, and disregard all evidence, and inferences therefrom, contrary thereto. The jury was entitled to accept, as they did, the state's construction of the evidence and to reject defendant's theory. *State v. Simmons*, 494 S.W.2d 302, 303 (Mo.1973); *State v. Harris*, 452 S.W.2d 577, 579 (Mo.1970).

*Qualification of judge to order change of venue.*

■ Defendant's next complaint is that the case was transferred from the Circuit Court of Randolph County to the Circuit Court of Cole County by order of the judge of the Randolph County Circuit Court. The motion for change of venue was filed by defendant on the grounds of "prejudice of the inhabitants of the 14th Judicial Circuit", as it is described in the minutes. Defendant argues that the "inhabitants" include the judge, and that therefore the judge ought not to be permitted to select the venue to which the case should be sent.

Defendant cites no case supporting his position, and the described procedure is the procedure prescribed by Supreme Court Rule 30.01.

The point is disallowed.

*Circumstantial evidence instruction.*

Defendant's next point is that the court refused his offered instruction MAI–CR No. 3.42. The instruction is the "circumstantial evidence" instruction.

Defendant states in his brief: "Admittedly, the general rule is that when the state's case rests in part on direct evidence, it is not error to refuse an instruction on circumstantial evidence even though requested. However, when the state's case rests wholly upon circumstantial evidence, the accused, upon proper request, is entitled to have the trial court instruct the jury on the collateral issue as to the effect of or weight to be given by the jury to circumstantial evidence. *State v. Stevens*, 467 S.W.2d 10, 25." (Mo.1971).

■ Defendant correctly states the law. Here the state's case consisted in substantial part of direct evidence of defendant's guilt—that is, the testimony of Sheila Jo that she saw and recognized defendant as one of her captors, and the testimony of Jeffrey Dean Austin that defendant had stated to him that he was one of the perpetrators of the kidnapping of the woman at Moberly. In such a case, although the state's case may consist partly also of circumstantial evidence, the circumstantial evidence instruction is not required to be given, though requested. *State v. Collor*, 502 S.W.2d 258, 259–260 (Mo.1973); MAI–CR 3.42, Notes on Use, n.2.

■ Defendant says, though: "It is unfair to deny the defendant the right to a circumstantial evidence instruction just because the state's proof consists of direct evidence in whole or in part." His argument is that the defendant had to rely upon the circumstantial rather than direct evidence for his defense theory, and the defendant should therefore be entitled to the circumstantial evidence instruction. He cites no case for his position, and we are bound by the long established rule set forth above. The "presumption of innocence" and "reasonable doubt" instruction of MAI–CR 2.20, which were given here, adequately presented to the jury a background for defendant's argument that circumstances shown by the evidence tended to show Sheila's complicity therein.

*Admission in evidence of report of scientific test, omitted from transcript.*

■ Next defendant complains of the exclusion of a laboratory report prepared by witness Robert Neill, a special agent of the Federal Bureau of Investigation, who specialized in microscopic examination and comparison of hair, fibers and textile mate-

rials. He had examined the duct tape which had been used for a blindfold and had compared the same with tape on the windows, and had compared two portions of a pair of pantyhose. He apparently had a written report in his hand as he testified. Defense counsel took the report, had it marked as Defendant's Exhibit No. 1, and offered it in evidence. It is referred to at one place as a "five or six-page report". The report has not been made a part of the record and it is impossible for us to review it, to determine whether there was any error in rejecting it, and if so whether such error was prejudicial. *Salsberry v. Archibald Plumbing & Heating Co.*, 587 S.W.2d 907 (Mo.App.1979); *Elliott v. Richter*, 496 S.W.2d 860, 864 (Mo.1973); *State v. Davis*, 237 Mo. 237, 140 S.W. 902 (1911). The court did tell the defense attorney he could use the report to cross-examine the witness, and the ruling only rejected the unedited report as a whole.

*Miscellaneous complaints not preserved for review.*

Defendant has added another point to his motion for a new trial and to his brief in this court. He says he was "denied due process of law" in several particulars. None of the allegations state any grounds for reversal of the conviction. We will list them as they appear in defendant's brief:

A. Defendant was transported across the Missouri-Illinois state line without any extradition requirements being satisfied;

B. Defendant was deprived of his liberty through the use of an excessive bond in the amount of $200,000;

C. Defendant was presented to the magistrate judge while in handcuffs;

D. Defendant's court-appointed attorney quit following the preliminary hearing, thereby requiring defendant to use an attorney for his trial who was not present at the preliminary hearing;

E. A prominent mid-Missouri criminal lawyer was appointed the defendant's attorney, but without notice to said attorney or to the defendant, the appointment was withdrawn, thereby denying the defendant an attorney who had expertise in criminal law;

F. No record was kept of the testimony at the preliminary hearing of the defendant;

G. The deposition of Sheila Embree, the alleged victim, was retained by Sheila Embree until a few days prior to trial;

H. Witnesses were present in the courtroom during the preliminary hearing;

I. While in custody, defendant's wallet was torn apart and all kinds of papers were taken;

J. Defendant was removed from Randolph County, Missouri, and transferred to Cole County, Missouri, without defendant being allowed to see his court-appointed attorney;

K. Defendant's mail was read so that he could not write to his court-appointed attorney concerning his case.

These allegations do not comply with Rule 84.04(d) which requires that points relied on "shall state briefly and concisely what *actions* or *rulings* of the court are sought to be reviewed and *wherein* and *why* they are claimed to be erroneous" (emphasis ours). They present nothing for review. *Thummel v. King*, 570 S.W.2d 679, 684-5 (Mo.banc 1978).

We have nonetheless considered them. They showed up for the first time in the motion for a new trial. Defendant on the hearing on the motion for new trial testified in their support, but the allegations were otherwise unsupported by the record. Allowing the truth of the allegations—and the credibility of the testimony was for the trial court, who could disbelieve it—there is no showing that any of the allegations could have prejudiced the defendant in the trial of the case. The point is without merit.

*Conclusion.*

The judgment is affirmed.

All concur.