Karen King Mitchell, Chief Judge
Justin Webb appeals, following a jury trial, his convictions of second-degree (felony) murder, § 565.021.1(2),[1] and first-degree endangering the welfare of a child, § 568.045.1(1), for which the court sentenced him to consecutive terms of thirty and seven years' imprisonment, respectively. Webb raises four claims on appeal: (1) the evidence was insufficient to support his convictions; (2) the trial court erred in admitting photographs of Victim after his death; (3) the trial court erred in admitting Victim's out-of-court statements to two of his teachers; and (4) the trial court violated Webb's Eighth Amendment right to be free from cruel and unusual punishment by sentencing him to a longer term of imprisonment than that of his co-perpetrator. Finding no error, we affirm.
Background[2]
On October 15, 2012, four-year-old Victim (born January 2, 2008) lived in an 1800-square-foot home in Holt, Missouri, with Webb (his father), Melissa Webb (Stepmother), and his younger brother (the child of Webb and Stepmother). That afternoon, around 1:30 p.m., Webb arrived home from work. Stepmother and Brother sat in the living room to play a board game, while Webb was doing something in the kitchen. Victim walked down the hall toward Stepmother and Brother when Stepmother approached Victim and kicked him, knocking him to the floor. Victim *535 tried to get away, but Stepmother kept kicking him repeatedly between the legs and in the abdomen, eventually causing Victim to vomit between screams. Brother tried to get Webb to stop the attack, but Webb did nothing. Stepmother eventually stopped, and Victim stumbled outside and fell on his knees and then to the ground. Brother told Webb, who told Brother to get Stepmother. Victim's eyes were closed, and Webb did something to Victim's mouth that Brother described as "holding up his tongue," and that investigators later believed to be an effort at CPR.
A call was made to 911 around 3:15 p.m., reporting a four-year-old child who was not breathing. When paramedics arrived, they observed Stepmother on the front porch performing CPR on Victim, Webb standing by, restraining a dog, and Brother off to the side. One of the paramedics asked what happened, and neither Webb nor Stepmother responded. The paramedic asked again, and again neither responded. Eventually, the paramedic was advised that Victim "had been kicked in the head at the fair a couple of days ago, had woken up with a bellyache, and now this." The paramedic asked how long Victim had been down and not breathing, and neither Webb nor Stepmother responded. The paramedic asked a total of three times how long Victim had not been breathing, and she never received an answer. Victim's heart was not beating, which suggested to the paramedic that Victim had not been breathing for a while;[3] she also observed dark discolorations around Victim's head. At that point, they put Victim in the ambulance and headed for the hospital.
On the way to the hospital, the paramedic tried to intubate Victim to get him oxygen, but she was unable to get his jaw open because it was rigid from the onset of rigor mortis.[4] Upon removing Victim's clothing, the paramedic observed "bruising around the side of the head on the right side, behind both ears, [and] down the back of his neck"; she also observed that Victim's penis was bruised. Victim had a "coffee grounds appearance coming from his nose and his mouth," which the paramedic said was "sometimes an indication of internal bleeding." When they arrived at the hospital and rolled Victim over, the paramedic observed large bruises on Victim's buttocks and lower back.
At the hospital, three physicians and all of the nursing, respiratory, laboratory, and X-ray staff were assembled in preparation for Victim's arrival. Hospital staff again tried to secure Victim's airway but were unable to open his jaw. Hospital staff noted the onset of rigor mortis in other areas of Victim's body besides his jaw. Victim was pronounced dead at 3:50 p.m.
The medical examiner performed an autopsy of Victim the next day. The first thing the examiner noticed was that Victim was underweight. The examiner documented the following injuries to Victim:
Extensive contusions and abrasions were found on the back, sides, cheeks, chin, forehead, and temples of his head. His outer lips were bruised, and his inner lips were lacerated. Internal hemorrhaging was found on the posterior regions of his head and neck. He had extensive contusions and abrasions on *536 the front, back, and sides of his torso, sacrum, and buttocks; his entire torso was discolored. His penis and scrotum were bruised, and his penis had two lacerations on its dorsal side. Multiple contusions and abrasions were located on all four of his limbs. Four healing broken ribs were discovered. Hemorrhages were found in his lungs, pancreas, diaphragm, and small bowel, and several lacerations located in multiple areas within his gastrointestinal system.
Victim had a thousand milliliters of blood in the abdomen, indicating that he had severe internal bleeding. The examiner determined that Victim's most significant injury-and the ultimate cause of his death-was a laceration in the small bowel. The examiner testified,
[I]njuries like this are caused by blows to the abdomen in young children, and what happens is that the skin surface is basically pushed all the way to the vertebral column, which is bone and it's hard. So all the tissues caught in between are split or torn or lacerated. So he has that kind of injury in the head of the pancreas; in the omentum, which hangs off of the stomach; the stomach is ruptured in two places; and the small bowel is split; and the tissue that supplies blood to the colon is also lacerated. So-and these are all organs that would have been caught-or, these are all tissues or organs that would have been caught between the blow and the vertebral column.
According to the examiner, a person suffering this kind of injury will "go into shock pretty rapidly, especially with this kind of blood loss."[5] And, "the dumping of all of these intestinal contents free into the abdomen ... sets up a terrible infection, and that's what[ ] caus[ed] th[e] discoloration over [Victim's] abdomen." The examiner indicated that this kind of injury would be immediately symptomatic and cause extreme pain; he surmised that Victim would "probably be rolling around in pain until he passe[d] out."[6] He further indicated that, if untreated, this kind of injury is fatal within a matter of hours. The examiner determined the cause of death to be "[b]lunt force injuries of the thorax and abdomen," and the manner of death to be homicide.
Two days after Victim's death, both Webb and Stepmother were interviewed by an investigator with the Major Case Squad. When asked about Victim's bruising, Webb claimed that Victim bruised easily, fell often, was easily injured, and had a high pain tolerance.[7] Webb further explained that giving Victim Vitamin D milk helped lessen Victim's bruising, but they had been out of Vitamin D milk for over two weeks at the time of Victim's death. Webb suggested that Victim had a habit of chewing on his own lips and that a heart defect caused Victim to burn energy at a high rate, leading to Victim being underweight. Webb suggested that the injuries to Victim's abdomen may have occurred *537 the evening before his death, when the family went to a fall gathering where Victim was playing on a hay bale and an older child jumped off the hay bale and landed on Victim. Webb suggested that the injuries to Victim's back and head occurred when Victim climbed the hay bale a second time and slipped off. When asked about the injuries to Victim's penis, Webb claimed that, on October 12, while Webb was in the kitchen cooking, he heard Brother and Victim in the bathroom. Apparently, Victim had been using the bathroom when Brother suddenly needed to go, and Brother did not wait for Victim to move before putting his seat on the toilet and smashing Victim's penis. Also on October 12, Webb observed a knot on Victim's head when Webb came home from work; he asked about it, and the boys said Victim fell off a truck. Stepmother claimed to know nothing about it.
When asked about the day of Victim's death, Webb said he arrived home around 1:30 or 2:00 in the afternoon, and Stepmother told him that Victim had been sick. So Webb checked on Victim, who appeared fine, and Webb then went to bed, as he had worked all night the night before. Webb said that he heard Victim ask for a drink of water, and shortly thereafter, he heard Stepmother scream for Webb to get up because they needed to take Victim to the hospital. According to Webb, Stepmother carried Victim outside, and Victim was throwing up down her back while she was on the phone with 911. Webb said that Stepmother then placed Victim on his back on the deck, per instructions from the 911 operator, and began CPR. Webb said that Stepmother did chest compressions while Webb provided breaths. Webb said that, when the paramedics arrived, they did nothing to assist either him or Stepmother, and instead just loaded Victim into the ambulance.
When the investigating officer advised Webb that Victim's fatal injury was to his abdomen and asked how that might have happened, Webb suggested they stop their meeting. Webb, nevertheless, continued describing other injury-producing events that occurred to Victim in the days preceding his death. At two different points in the interview, Webb discussed that the last time they had taken Victim to the doctor, it was for nausea, vomiting, and bruising. According to Webb, the doctor could not describe what was causing the bruising but had provided some anti-nausea medicine so Victim could eat and keep food down.
Before his death, Victim attended a preschool for children with developmental delays.[8] One of his teachers described him as "a very athletic little boy." She said that "[h]e liked to climb. He liked to run and play.... [H]e was very agile. He was not at all clumsy." In November of 2011, during a class bathroom break, Victim's classroom teacher Pamela Miller noticed severe bruising on Victim's bottom. When she asked what happened to him, Victim said "Daddy get mad at me and hit me with a-with a stick."[9] He also said, "I was on daddy's boat and I fell and Daddy get mad." Again on January 10, 2012, Miller noticed bruising on Victim's bottom and, when she asked Victim about it, he said, "Daddy get mad at me and hit me with a switch." That same day, Miller contacted the child abuse hotline.[10] As time progressed, *538 Miller noticed more bruises than she would expect from normal play, and she notified Victim's family of her concerns. Multiple emails went back and forth, and Victim's attendance became irregular.[11] Between February and April of 2012, Victim missed 21 out of 37 school days. On April 20, 2012, Stepmother removed Victim from his preschool.
Victim returned to his preschool in the fall of 2012, and he was put in Staci Bonderer's class. On August 20, 2012, Victim attended a back-to-school open house, and Bonderer noticed that Victim was much thinner than she remembered him being the prior spring. On August 23, the first day of school, Bonderer noticed that Victim acted very tired and seemed very frail. Victim asked for more drinks than most children,[12] and he did not play during recess time. The next day, when Bonderer took Victim to the bathroom, he said that "a monster plays with his pee-pee." Victim refused to play during the day and instead laid at his table with his head down. Later, on the way out to the bus, Victim told Bonderer that sometimes he didn't feel good. Bonderer asked him what hurts when he feels bad, and "he said that it hurts when his mom kicks him in the stomach with her foot." Bonderer asked Victim if his mom was happy or mad when she kicked him with her foot, and he said she was mad; he also remarked that she had made him swallow a Pop Tart. On August 27, 2012, Bonderer noticed that Victim had scabbed-over teeth marks on his lips; when she asked about it, Victim said that Brother pushed him off the stroller. On August 31, 2012, Bonderer again noticed that Victim was very lethargic and did not play much at playtime. She also noted that he cried when it was time to go to the bathroom and did not want to go.
Following Labor Day weekend, Victim attended school on only Friday of that week (September 7, 2012), and he had bruising on his arms and legs, and it was mostly on one side of his body. Bonderer contacted the school counselor to have her discuss the bruises with Victim. When asked how he got the bruises, Victim said he fell off a boat. An examination of Victim revealed a total of nine bruises, with some on his leg and others on his cheeks and eyes. Victim also had a scabbed-over bite mark on his back. A report was then made to the child abuse hotline.[13] On September 20, 2012, Victim came to school with a bruise on his cheek. Victim told Bonderer, "my mom said it's none of your business. She said, tell you none your ... businesses." That was the last day Bonderer saw Victim, as he did not attend school for the remaining weeks before his death.
Both Webb and Stepmother were criminally charged with respect to Victim's injuries and death. Stepmother pled guilty to second-degree (felony) murder and felony abuse of a child. Pursuant to a plea agreement, she was sentenced to concurrent terms of 20 years for felony murder and 15 years for abuse of a child.[14] Webb was *539 charged, as an accomplice, with second-degree (felony) murder and first-degree endangering the welfare of a child.
Before trial, the State filed a motion to admit out-of-court statements from Victim to both Miller and Bonderer under § 491.075. Webb objected, arguing that Victim's statements were "too remote in time" to "provide sufficient indicia of trustworthiness and reliability" and that they violated Webb's Sixth Amendment right to confront his accusers insofar as the statements were testimonial. The trial court overruled Webb's objections and ordered that the statements were admissible.
At trial, Webb testified in his own defense. Webb testified that he returned home from work and running errands around 1:30 p.m. on October 15, 2012. He testified that, when he arrived home, Stepmother met him at the door and had a discussion with him about Victim. As a result of the conversation, Webb went to Victim's bedroom to check on him. Victim was lying on a pallet on the floor. Webb asked Victim what was wrong, and Victim said he was sick to his stomach. Webb then brought some items in from his truck before going back to Victim's bedroom to see him again. Webb claimed that Victim again complained that his belly hurt and said that he thought he ate too much. Webb then went to bed.
Shortly thereafter, he heard Victim and Stepmother walking down the hallway, and Victim asked for a glass of water. Webb fell asleep but was awakened when Stepmother screamed at him, telling him to get up because they needed to go to the hospital. Webb claimed that Stepmother was carrying Victim out to the car and that he saw Victim look up at him just before vomiting all over Stepmother's shoulder. As Webb was putting Brother's shoes on, Stepmother told him to grab her cell phone. Stepmother then ran back inside, telling Webb that Victim had collapsed. According to Webb, Stepmother then called 911 and was advised to lay Victim on his back and start CPR, which they did until the ambulance arrived and took Victim away.
Webb acknowledged knowingly leaving Victim in Stepmother's care, custody, and control on multiple occasions, including September and October of 2012. Webb also acknowledged that he and Stepmother had been reported to DFS based upon Victim's bruises in September 2012. But Webb denied knowing that Victim had missed two-to-three weeks of school right before he died.
The jury found Webb guilty as charged, and the trial court sentenced him to consecutive terms of thirty and seven years' imprisonment.[15] Webb appeals.
Analysis
Webb raises four claims on appeal. First, he argues that the evidence was insufficient to support his convictions; specifically, he argues that the evidence failed to establish the requisite mental element for child endangerment. Second, Webb argues that the trial court erred in admitting State's Exhibits 8, 9, and 10 (photos of Victim's body) because the photos were inflammatory, prejudicial, and unnecessary to establish Victim's cause of death. Third, Webb argues that the trial court erred in admitting Victim's out-of-court statements to Miller and Bonderer because the statements constituted testimonial hearsay and *540 their admission violated his Sixth Amendment right to confrontation. Finally, Webb argues that the trial court violated his Eighth Amendment right to be free from cruel and unusual punishment when it sentenced him to a longer total sentence than Stepmother.
A. The evidence was sufficient to support the jury's determination that Webb knowingly acted in a manner that created a substantial risk to Victim's life, body, or health.
In his first point on appeal, Webb challenges the sufficiency of the evidence to support his convictions. More specifically, he argues that the evidence did not establish the requisite mental element for first-degree child endangerment.
In reviewing challenges to the sufficiency of the evidence, "[t]he function of the reviewing court is not to reweigh the evidence, but only to determine whether the judgment is supported by sufficient evidence ... from which a trier of fact reasonably could have found the defendant guilty."[16] State v. Loughridge , 395 S.W.3d 605, 607 (Mo. App. S.D. 2013). This is "a question of whether, in light of the evidence most favorable to the State, any rational fact-finder could have found the essential elements of the crime beyond a reasonable doubt." Id. "When reviewing a challenge to the sufficiency of the evidence, an appellate court accepts as true all of the evidence favorable to the State, including all favorable inferences drawn from the evidence." Id. "All contrary evidence and inferences are disregarded." Id. "The State may prove its case by presenting either direct or circumstantial evidence connecting the defendant to each element of the crime." Id. (quoting State v. Howell , 143 S.W.3d 747, 752 (Mo. App. W.D. 2004) ).
"A person commits the crime of endangering the welfare of a child in the first degree if ... [t]he person knowingly acts in a manner that creates a substantial risk to the life, body, or health of a child less than seventeen years old." § 568.045.1(1). "A person 'acts knowingly' ... [w]ith respect to his conduct or to attendant circumstances when he is aware of the nature of his conduct or that those circumstances exist." § 562.016.3(1). In short,
[t]he four elements the State must prove in order to convict a defendant of first-degree child endangerment are: "(1) the defendant engaged in conduct, (2) in so doing, the defendant created a substantial risk to the life, body, or health of a child, (3) the victim was less than seventeen years old, and (4) the defendant acted knowingly with respect to the facts and circumstances."
Loughridge , 395 S.W.3d at 609 (quoting State v. Short , 186 S.W.3d 828, 830-31 (Mo. App. E.D. 2006) ).
"Determining whether a defendant's actions created a substantial actual risk to the health of the child requires 'a fact specific determination.' " Id. at 610 (quoting State v. Burrell , 160 S.W.3d 798, 802 (Mo. banc 2005) ). "There is no bright[-]line test to determine whether or *541 not a person's actions knowingly create a substantial risk to the health of a child." Id. (quoting Burrell , 160 S.W.3d at 802 ). "In making this determination, 'we look to the totality of the circumstances.' " Id. (quoting State v. Cole , 384 S.W.3d 318, 325 (Mo. App. S.D. 2012) ). "The mental element of the defendant's knowledge may be proven by direct evidence and reasonable inferences drawn from the circumstances surrounding the incident." Id. (quoting State v. Manwarren , 139 S.W.3d 267, 272 (Mo. App. S.D. 2004) ).
Here, the jury was instructed to find Webb guilty of first-degree child endangerment under the theory that Webb allowed Stepmother exclusive control and access to Victim and, in doing so, created a substantial risk to the life, body, or health of Victim. At trial, Webb admitted knowingly leaving Victim in Stepmother's care, custody, and control. Thus, the only question before us is whether, in doing so, Webb knew that he was creating a substantial risk to Victim's health.
Despite Webb's arguments to the contrary, the evidence here was sufficient for a reasonable jury to determine that Webb knew Stepmother was abusing Victim. To begin, Brother testified that Webb was in the house, within earshot, when Stepmother violently assaulted Victim, resulting in his death, yet Webb did nothing to stop her. "While the mere presence of an accused at the scene of a crime will not sustain a conviction, presence may be considered along with other incriminating evidence to determine if the total circumstances raise a reasonable inference that the accused was a participant in the offense charged." State v. Puckett , 611 S.W.2d 242, 245 (Mo. App. E.D. 1980). After Victim died from his injuries, Webb engaged in a cover-up with Stepmother by repeatedly lying to the paramedics and investigators about how Victim sustained his numerous serious injuries. "A permissible inference of guilt may be drawn from acts or conduct of an accused subsequent to an offense if they tend to show a consciousness of guilt by reason of a desire to conceal the offense or role therein." Loughridge , 395 S.W.3d at 611 (quoting State v. Schwartz , 899 S.W.2d 140, 144 (Mo. App. S.D. 1995) ). Additionally, "[e]xculpatory statements, when proven false, evidence a consciousness of guilt[.]" State v. Buchli , 152 S.W.3d 289, 297 (Mo. App. W.D. 2004) (quoting State v. Clay , 975 S.W.2d 121, 140 (Mo. banc 1998) ). And "[g]uilt may be inferred when an accused attempts to deceive the police, as in making a false exculpatory statement." Id. (quoting State v. Hibbert , 14 S.W.3d 249, 253 (Mo. App. S.D. 2000) ). Following Victim's death, Webb remained married to Stepmother, even after she pled guilty to assaulting and murdering Victim-Webb's own son. "Presence, companionship and conduct before and after the offense are circumstances from which one's participation in the crime may be inferred." Puckett , 611 S.W.2d at 245. Furthermore, well before the fatal incident, Webb knew that Victim's teachers were concerned about numerous bruises on Victim's body, and he knew that Victim had been the subject of a child abuse hotline call on two different occasions. Additionally, prior to the date of his death, Victim had sustained extensive injuries, including at least four broken ribs, that would have been obvious to those around him. Yet Webb continued to leave Victim in Stepmother's care. As such, when he knowingly left Victim in Stepmother's care, he knowingly created a substantial risk to Victim's health.
Point I is denied.
B. We are unable to review Webb's claim regarding error in the admission of State's Exhibits 8, 9, and 10 because *542 he has failed to provide these Exhibits to this court.
In his second point on appeal, Webb argues that the trial court erred in admitting State's Exhibits 8, 9, and 10, which were photographs of Victim's body following his death.[17] Webb argues that the photographs were inflammatory, prejudicial, and unnecessary to establish Victim's cause of death.
"It is well settled that slides and photographs of a murder victim are admissible, even though they are undeniably gruesome and shocking, if they are relevant to a material issue in the case." State v. Masden , 990 S.W.2d 190, 193 (Mo. App. W.D. 1999). But Webb has not included these Exhibits in our record on appeal. Nor does it appear that he has requested the State to obtain and file them. "If original exhibits are necessary to the determination of any point relied on, they shall be deposited in the appellate court by the appellant." Rule 81.16(a). "If a party other than appellant has custody of exhibits, appellant may request that party to either deposit the exhibits with the appellate court or deliver them to appellant for deposit with the court." Id. "Any exhibits not timely deposited may be considered by the court as immaterial to the issues on appeal." Rule 81.16(d).
Thus, while we have no doubt that the photographs of the four-year-old victim's bruised and broken body were graphic and disturbing, we cannot discern whether they crossed the line into inflammatory and prejudicial without being able to actually view them. Accordingly, we are unable to review this claim of error. See State v. Stout , 591 S.W.2d 225, 230 (Mo. App. W.D. 1979) (noting that the report at issue "ha[d] not been made a part of the record and it is impossible for us to review it, to determine whether there was any error in rejecting it, and if so whether such error was prejudicial").[18]
*543 Point II is denied.
C. The trial court did not err in admitting Victim's out-of-court statements.
In his third point on appeal, Webb argues that the trial court erred in admitting Victim's out-of-court statements to Miller and Bonderer. He claims that Victim's statements constituted testimonial hearsay, and their admission violated his Sixth Amendment right to confrontation. We disagree.
"Trial courts have broad discretion to admit or exclude evidence at trial." State v. Mayes , 63 S.W.3d 615, 627 (Mo. banc 2001). "Unless this discretion was clearly abused, error will not be found." Id. "Whether admission of the challenged testimony violated the Confrontation Clause is a question of law, which the Court reviews de novo. " State v. Justus , 205 S.W.3d 872, 878 (Mo. banc 2006).
Under the Sixth Amendment to the United States Constitution, "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." U.S. Const. Amend. VI. "Where testimonial evidence is at issue, ... the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination." Justus , 205 S.W.3d at 878 (quoting Crawford v. Washington , 541 U.S. 36, 68, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) ). In other words, "to admit 'testimonial' hearsay statements of an unavailable witness, the accused must have had an opportunity to confront, i.e. , cross-examine, the witness." Id. (citing Crawford , 541 U.S. at 42, 68, 124 S.Ct. 1354 ). Statements "are testimonial when the circumstances objectively indicate that there is no ... ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." Davis v. Washington , 547 U.S. 813, 822, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006).
The statements at issue here were admitted under § 491.075, which provides that "[a] statement made by a child under the age of fourteen ... relating to an offense under chapter ... 568 ... is admissible in evidence in criminal proceedings in the courts of this state as substantive evidence to prove the truth of the matter asserted" under certain conditions. To be admissible, the trial court must find, "in a hearing conducted outside the presence of the jury[,] that the time, content and circumstances of the statement provide sufficient indicia of reliability; and [that] ... [t]he child ... testifies at the proceedings ... or ... is unavailable as a witness." § 491.075.1. But, even if statements are otherwise admissible under the provisions of § 491.075.1, their admission may violate the Confrontation Clause if the statements are testimonial and the defendant has not had an opportunity to cross-examine the declarant. Justus , 205 S.W.3d at 881.
Here, Webb does not challenge the admissibility of the statements under § 491.075.1.[19] Rather, he argues that, because the statements were made to Victim's teachers who are, by law,[20] mandated reporters of suspected child abuse or *544 neglect, the statements were necessarily testimonial in nature and, therefore, inadmissible under the Confrontation Clause because Webb never had the opportunity to cross-examine Victim with respect to the statements.
This same claim was recently rejected by the United States Supreme Court in Ohio v. Clark , --- U.S. ----, 135 S.Ct. 2173, 192 L.Ed.2d 306 (2015). In Clark , the issue before the Court was "whether the Sixth Amendment's Confrontation Clause prohibited prosecutors from introducing ... statements [from a three-year-old child to his teacher about the source of apparent injuries] when the child was not available to be cross-examined." Id. at 2177. In arguing that the child's statements were "testimonial," the defendant emphasized the state's mandatory reporting obligations "in an attempt to equate [the child's] teachers with the police and their caring questions with official interrogations." Id. at 2182-83. The Supreme Court held that "the comparison is inapt." Id. at 2183. The Court noted that "[t]he teachers' pressing concern was to protect [the child] and remove him from harm's way. Like all good teachers, they undoubtedly would have acted with the same purpose whether or not they had a state-law duty to report abuse." Id. The Court held that "mandatory reporting statutes alone cannot convert a conversation between a concerned teacher and her student into a law enforcement mission aimed primarily at gathering evidence for a prosecution." Id. Accordingly, the Court denied relief on the ground that, "[b]ecause neither the child nor his teachers had the primary purpose of assisting in [the defendant's] prosecution, the child's statements [did] not implicate the Confrontation Clause and therefore were admissible at trial." Id. at 2177.
The same is true here. Both Miller and Bonderer were acting out of concern for Victim's well-being and not for purposes of assisting in Webb's prosecution. And we are hard-pressed to hold that Victim, a then three-year-old child, had any such prosecutorial purpose in mind when expressing his thoughts to his teachers. As such, admission of Victim's statements to Miller and Bonderer did not violate Webb's Sixth Amendment right to confront the witnesses against him.
Point III is denied.
D. The trial court did not violate Webb's Eighth Amendment right in sentencing him to an overall longer term of imprisonment than Stepmother.
In his final point, Webb argues that the trial court violated his Eighth Amendment right to be free from cruel and unusual punishment insofar as he was sentenced to an overall longer prison term than Stepmother, who actually caused Victim's death. The State urges us to reject this claim for lack of preservation because Webb's Eighth Amendment challenge was not raised at any point below.
"To preserve a constitutional claim of error, the claim must be raised at the first opportunity with citation to specific constitutional sections." State v. Oates , 540 S.W.3d 858, 863 (Mo. banc 2018) (quoting State v. Driskill , 459 S.W.3d 412, 426 (Mo. banc 2015) ). "If not raised at the first opportunity in the circuit court, a constitutional claim is waived and cannot be raised [on appeal]." Id. (quoting State v. Fassero , 256 S.W.3d 109, 117 (Mo. banc 2008) ). An "unpreserved constitutional claim is subject to discretionary review only for plain error." Id. "With plain-error review, 'the defendant bears the burden of establishing manifest injustice.' " Id. (quoting State v. Baxter , 204 S.W.3d 650, 652 (Mo. banc 2006) ). Where an appellant "does not even request plain-error review, he has made no attempt to carry this burden," and the claim will be summarily denied. Id.
*545 Here, Webb does not acknowledge his failure to raise this claim below; thus, he makes no request for plain error review. As such, Point IV is denied.[21]
Conclusion
The evidence was sufficient to support Webb's convictions, and Webb has failed to establish trial court error in either the admission of evidence or the sentence given for his convictions. Accordingly, its judgment is affirmed.
Victor C. Howard and Lisa White Hardwick, Judges, concur.

All statutory citations are to the Revised Statutes of Missouri, Cum. Supp. 2012, unless otherwise noted.

"In reviewing the sufficiency of the evidence, all evidence favorable to the State is accepted as true, including all favorable inferences drawn from the evidence." State v. Nash , 339 S.W.3d 500, 509 (Mo. banc 2011). "All evidence and inferences to the contrary are disregarded." Id.

Paramedic testified that, if Victim's breathing had stopped shortly before the 911 call, she would have expected to still observe electrical activity in the heart.

The paramedic testified that rigor mortis typically begins in the small facial muscles. The medical examiner testified that the timing of the onset of rigor mortis varies, but it occurs faster in children and faster where there is an element of infectious disease, as was the case here.

The examiner testified that loss of one-and-a-half liters of fluid in a 150-pound adult male would be fatal. Victim had a liter of fluid in his abdomen, and he weighed only 41 pounds.

Because of the nature of Victim's injuries, Brother was immediately removed from the home and placed with a foster family. Shortly thereafter, while playing a game on the floor with his foster mother, Brother spontaneously began rolling around on the floor and then said that is what happened to Victim "when his mommy kicked him."

When asked how he knew Victim had a high pain tolerance, Webb described an incident where Victim was playing in the backyard when he fell and hit his testicles, causing them to swell to the size of a softball, and they were able to treat his injury with just an ice pack.

Victim had demonstrated some speech language difficulties.

During his interview with the investigator, Webb indicated that, when he was a child, his father punished him with a switch.

Though the record is unclear, it appears that the Department of Family Services (DFS) responded to Victim's home, but looked only for whether there was sufficient food and not whether Victim was being abused.

During his interview with the investigator, Webb acknowledged receiving the reports from Victim's teacher about concerns over injuries.

The medical examiner testified that internal bleeding can lead to dehydration.

Again, for reasons not explained in the record, DFS responded by investigating whether there was sufficient food in the home and not whether Victim was being abused.

The terms of Stepmother's sentence are taken from Webb's brief. Nothing in the record provided to this court, however, reflects her actual sentences. The State does not challenge Webb's assertion; instead, the State argues that the terms of Stepmother's sentences are irrelevant. Case.net indicates that Webb's assertion is accurate. Though we ultimately agree with the State, we note the alleged terms here simply to provide context and background to Webb's argument in his fourth point relied on.

Webb waived jury sentencing.

The State argues that Webb waived this claim insofar as his point relied on argues error in the overruling of his motion for judgment of acquittal at the close of the State's evidence, following which, Webb put on evidence. Although the point relied on does identify the overruling of Webb's motion for judgment of acquittal at the close of the State's evidence, "no motion for judgment of acquittal needs to be filed prior to the submission of the case in order for a defendant to seek a judgment of acquittal after the verdict." State v. Claycomb , 470 S.W.3d 358, 361 n.3 (Mo. banc 2015). Accordingly, we reject the State's claim of waiver.

Though Webb objected when these photographs were first offered, later, at the close of the State's case, when the State went through all of its exhibits again to ensure they had been admitted, Webb indicated that he had no objection to the photographs:
[PROSECUTOR]: I want to make sure Exhibits 1 through 10 have been offered and admitted. Those are photographs.
THE COURT: All right.
[DEFENSE COUNSEL]: I believe that's correct, Judge.
THE COURT: All right. I show that they have. Are you reoffering them-
[PROSECUTOR]: Yes.
THE COURT: -in the event they haven't?
[PROSECUTOR]: Yes, Your Honor.
[DEFENSE COUNSEL]: One through 10?
[PROSECUTOR]: One through 10.
[DEFENSE COUNSEL]: We have no objection.
(Emphasis added.) "[T]he general rule in Missouri is that a statement of 'no objection' when the evidence is introduced affirmatively waives appellate review of the admission." State v. Davis , 533 S.W.3d 781, 786 (Mo. App. S.D. 2017) (quoting State v. Williams , 411 S.W.3d 275, 277 (Mo. App. S.D. 2013) ). But, because the State does not argue that Webb's claim is waived, we need not consider this issue.

It is doubtful that this claim would have been successful, even if the exhibits had been provided, as the nature and severity of Victim's wounds went directly to the issue of whether Webb knew that leaving Victim with Stepmother amounted to a substantial risk to Victim's health. "Generally, gruesome photographs are admissible if they: (1) show the nature and location of wounds ; (2) enable jurors to better understand the testimony at trial; and (3) aid in establishing an element of the State's case." State v. Johnson , 244 S.W.3d 144, 161-62 (Mo. banc 2008). Additionally, Webb does not make any claim of prejudice arising from admission of the photographs. "[I]n cases concerning the admission or exclusion of evidence, we review for prejudice, not mere error, and will reverse only if the error was so prejudicial that it deprived the defendant of a fair trial." State v. Maples , 551 S.W.3d 634, 645 (Mo. App. W.D. 2018) (quoting State v. Cofield , 95 S.W.3d 202, 205 (Mo. App. S.D. 2003) ).

Any such challenge would have been meritless, as the trial court held a hearing, after which it determined that Victim was under the age of fourteen at the time he made the statements; that, because he was deceased, he was unavailable as a witness; and that the time, content, and circumstances of the statements provided sufficient indicia of reliability to allow their admission as substantive evidence.

See § 210.115.1.

In any event, Webb's sentences were within the statutorily prescribed range of punishment for the offenses with which he was convicted. "When the sentence imposed is within the range prescribed by statute, the sentence generally will not be found excessive, or grossly disproportionate, to the crime committed." Burnett v. State , 311 S.W.3d 810, 814 (Mo. App. E.D. 2009). Furthermore, in light of the fact that Webb's sentence was not grossly disproportionate to his crimes, it is irrelevant that Stepmother's overall term was shorter than Webb's. "[C]omparison to sentences given to other defendants for the same or a similar crime is irrelevant except when the court finds the sentence in question grossly disproportionate." State v. Lee , 841 S.W.2d 648, 654 (Mo. banc 1992) (citing Harmelin v. Michigan , 501 U.S. 957, 1004-05, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991) ).